AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Damion Mckenzie,<br>Defendant(s) | Case No. 20-6316-Hunt |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __May 15-July 2, 2020__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343 and 2 | Wire Fraud |
| 18 U.S.C. §§ 1344 and 2 | Bank Fraud |
| 18 U.S.C. § 1349 | Conspiracy/Attempt to Commit Wire and Bank Fraud |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
Complainant's signature

Michael Benivegna, Special Agent, IRS-CI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 8/3/2020

_____
Judge's signature

City and state: Ft. Lauderdale, Florida   Hon. Patrick M. Hunt, U.S. Magistrate Judge
Printed name and title

## AFFIDAVIT

I, Michael Benivegna, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this Affidavit in support of a criminal complaint charging DAMION MCKENZIE ("MCKENZIE" or "Defendant"), with wire fraud, bank fraud, attempt and conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344, 1349, and 2, from on or about May 15, 2020 to at least on or about July 2, 2020, in the Southern District of Florida, and elsewhere (the "Target Offenses").

2. Defendant has participated in a scheme to obtain by fraud millions of dollars in forgivable loans through the Paycheck Protection Program ("PPP") and other government programs, conspiring with a person now cooperating with the investigation ("CHS 2") and others. Defendant sought a fraudulent PPP loan for his own company, Five Plus Investment Group LLC ("Five Plus"), with CHS 2 providing falsified documents and submitting the application on Defendant's behalf. Defendant also conspired to submit a number of additional fraudulent PPP loan applications for other companies by recruiting other confederate loan applicants, in order to receive kickbacks from those confederates. To inflate the size of these PPP loans, and the corresponding kickbacks, the conspirators relied on a variety of false statements, including by submitting falsified bank statements and payroll tax forms. For example, the conspirators used nearly identical versions of the same fabricated bank statements, recycled in the PPP applications for multiple companies with minor changes.

3. The conspirators in the scheme planned or prepared at least 90 fraudulent applications, most of which were submitted. Based on the evidence investigators have reviewed to date, CHS 2, Defendant, and their co-conspirators applied for PPP loans that are together worth

more than $24 million dollars, with at least approximately 42 of those loans approved and funded for a total of approximately $17.4 million. Certain of those loan recipients then wired a kickback of varying amounts, often approximately 25% of the fraudulent loan proceeds, to an account controlled by CHS 2.

4. I am a Special Agent with the United States Department of The Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been employed in this capacity since October 2016. I am presently assigned to the Miami Field Office. My duties as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Code (Title 26 of the United States Code), the Bank Secrecy Act (Title 31 of the United States Code), and the Money Laundering Statutes (Title 18 of the United States Code). I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in April 2017 and the Special Agent Investigative Techniques program at the National Criminal Investigation Training Academy in July 2017. In these two programs, I studied a variety of law enforcement tactics and criminal investigator techniques relating to tax and financial crimes. Since becoming an IRS-CI Special Agent, I have personally investigated and assisted in investigations relating to the Internal Revenue Laws and financial crimes. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners, including the Federal Bureau of Investigation and the Small Business Administration Office of Inspector General, to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 program.

5. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and from witnesses.

This Affidavit is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.[1]

## PROBABLE CAUSE

### *The Paycheck Protection Program*

6. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP. In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

7. In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

---

[1] The conduct and charges described in this Affidavit are part of a larger investigation that is being conducted in this District and elsewhere. As a result, not all numbered sources and anonymous individuals and entities are described in every filing. I have included in this Affidavit only those individuals and entities I have deemed necessary to explain the particular facts set forth here.

8.  A PPP loan application must be processed by a participating lender. If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

9.  PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

### *The Scheme to Obtain Fraudulent PPP Loans*

10. On or about May 13, 2020, Phillip J. Augustin ("Augustin") and CHS 2 worked together to submit a fraudulent PPP loan application on behalf of a company owned by Augustin. Augustin submitted a PPP loan of $84,515 to a federally insured bank (hereinafter "Bank 3"), through a third-party company processor (hereinafter "Bank Processor 1").[2] The application included bank statements that are clear forgeries, and CHS 2 has admitted that the application was based on documents that he falsified for Augustin.[3]

---

[2] All banks referenced in this Affidavit are insured by the Federal Deposit Insurance Corporation.

[3] On June 25, 2020, investigators arrested CHS 2 and another person now cooperating with the investigation ("CHS 3") and executed search warrants at their residences. Following his arrest, CHS 2 chose to cooperate with the investigation in the hope of obtaining favorable consideration in connection with his pending charges. CHS 2 was interviewed on that day, and has continued to cooperate with the investigation after obtaining counsel. Most of his statements related herein have been corroborated by records obtained from third parties or recovered from his electronic devices.

11. Following the success of that initial fraudulent PPP application, Augustin and CHS 2 began to work on obtaining more and larger PPP loans for Augustin's associates and others, generally for several hundred thousand dollars for each loan, up to as much as approximately $1.24 million. Based on the evidence investigators have reviewed so far, CHS 2 and Augustin collectively coordinated applications for PPP loans that are together worth more than $24 million dollars. The evidence also shows many more PPP loans were attempted but rejected by banks or their partners, or were planned and prepared, but not submitted before CHS 2's arrest. The evidence suggests that all or nearly all of those loan applications were fraudulent, including Defendant's loan application and the applications Defendant orchestrated by referring additional confederates to the conspiracy.

12. Investigators have obtained many other PPP loan applications that CHS 2 has admitted he submitted as part of this scheme, based on falsified documents, and have also obtained draft documents used or intended to be used in those applications or others. These applications all follow the same pattern of fraud—many with obviously counterfeit February 2020 bank statements, and all with fabricated IRS Forms 941 (titled, "Employer's Quarterly Federal Tax Return") with the same indicia of fraud found in Augustin's initial application—but generally with even larger inflated payroll numbers, thus yielding much larger loans.[4] CHS 2 has explained to investigators that the figures in the Forms 941 were the product of a formula that allowed him to start with a target loan amount, and then "back into" the payroll figures on the form. He explained how he used figures that would produce an average monthly payroll for 2019 that, when multiplied by 2.5, would yield the requested loan amount. In turn, the number of employees reported was

---

[4] Some loan applications also included voided checks that appear to be falsified, such as a purported Bank 5 check that appears to have been produced on a computer and, as the subject line reads, "Converted to PDF," rather than a scan of an authentic check.

chosen based on fictional payroll figures, chosen to avoid an average employee salary that might raise suspicion.

13. CHS 2 has also explained that he tried to use bank statements showing that the company had a large balance. Because so few companies had such a statement, and likely also because it was easier than keeping track of their true statements, CHS 2 repeatedly submitted near-replicas of the same falsified bank statements. In particular, CHS 2 appears to have recycled one statement each from Bank 1, Bank 6, and Bank 7. In recycling a statement, CHS 2 generally changed only the account number and the account holder's name and address, such that each version of the statement had identical figures and line items throughout the statement.

14. A review of records for bank accounts controlled by CHS 2 at Bank 5 confirm CHS 2's admissions that he received numerous kickbacks, often of approximately 25% of the amount of the loans, and that he regularly wired Augustin a share of that kickback in the early stages of the scheme. CHS 2 explained that they were doing so many loans by the end of May that he changed course, instead wiring larger lump sums, collecting Augustin's shares of the kickbacks for multiple loans in one wire.

15. Investigators are still receiving and analyzing records, but based on a preliminary analysis, as of July 24, 2020, investigators had identified a total of $2,367,765.82 in transfers to CHS 2's accounts from entities that each obtained a sizable PPP loan and that were identified in the PPP files seized from CHS 2's and another co-conspirator's residences, as described below—or from individuals associated with those entities.

16. The PPP loans identified above as implicated in the foregoing kickback payments to CHS 2 represent only a fraction of the overall scheme. In executing search warrants at the respective residences of CHS 2 and CHS 3, federal agents found stacks of paper printed out and

organized by entity, containing an "intake form," fabricated Forms 941, or both for each entity. The intake forms contained fields for the information needed to fabricate the documents and fill out other aspects of the PPP application: identifying information about the owner and company, as well as bank account information for receiving the loan. A section at the end marked "BELOW IS OFFICE USE ONLY" included blank fields for the "Number of Employees," "Monthly Payroll Expense," and "SBA Loan Pre-Approval Amount." Between CHS 2's and CHS 3's residences, investigators seized paper files for PPP loan applications for approximately 80 different entities.

17. Data obtained from the SBA showed additional PPP loan applications from additional entities that text message and email records show had been referred to CHS 2 by Defendant or other individuals.

### *The Fraudulent PPP Loan to Defendant's Company: Five Plus*

18. According to Florida's Division of Corporations website ("Sunbiz"), Five Plus was incorporated in 2018 with its listed principal address in Miami, Florida. MCKENZIE is listed on Sunbiz as one of five managers of Five Plus with a separate address in Miami Gardens, Florida. According to separate bank records, on or about May 26, 2020, MCKENZIE opened a bank account in the name Five Plus and listed himself as the sole signatory on the account.

19. From on or about May 16, 2020 through on or about May 19, 2020, an application and supporting documents for a PPP loan were electronically submitted on behalf of Five Plus to Bank 2 through Bank Processor 1. The submitted documents included, among other things: (1) purported Forms 941 for all four quarters of 2019; (2) a company bank statement for Five Plus; and (3) two blank checks.

20. The purported Forms 941 show quarterly payroll of almost $300,000 each quarter, for 10 employees. Each was signed by hand with the name "Damion McKenzie" as the company

owner, and also listed MCKENZIE as the company's designee and as a "Paid Preparer," though he is not a paid tax preparer. The Five Plus Forms 941 follow the same style and pattern as the many other falsified Forms 941 that CHS 2, described above, acknowledged that he helped create and submit in the course of the scheme, including in the indicia of fraud.[5] IRS records show that Five Plus did not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020, and Florida Department of Revenue records show that Five Plus did not report any wages or employees for that same period.

21. The purported company bank statement, which was submitted in electronic, PDF format, is a clear forgery. First, the statement is not from Five Plus's bank. Second, according to the document's file "properties," the statement was created using "PDFFILLER," a program used to edit electronic PDF files, and was "modified using iText."

22. In a letter dated June 2, 2020, Bank Processor 1 informed MCKENZIE that his PPP loan application was rejected. The following reason was stated on the letter for the rejection: "Unable to verify Applicant's identity from documents submitted or discrepancies in information submitted."

---

[5] As noted above, MCKENZIE was listed as both owner and paid preparer. Dozens of other Forms 941 submitted in this scheme evidence the same error. CHS 2 has admitted that these documents share that feature because he misunderstood the form, and he (or someone following his instructions) prepared all of the Forms 941 at issue. The content of the forms also indicate falsification. All four quarterly forms are nearly identical, and the four forms for Five Plus are identical, down to the penny, in reported figures. They also evidence a pattern of payroll spending that is likely false: each of the quarters shows increases from the first to second to third month of the quarter. For each identical form, the same figures are reported for the tax liability incurred in the first month of each quarter, the same figure for the second month of each quarter (increased from the first month), and the same figure for the third month of each quarter (increased from the second month). The result is that the company reports a perfectly repeating cycle of ascending payroll costs within each quarter, dropping down again at the start of the next quarter. CHS 2 has explained that this was due to a formula he used, allocating different percentages of the quarterly payroll tax liability to each month of each quarter.

### *CHS 2 Confirmed to Law Enforcement that the Five Plus PPP Loan Application Was Fraudulent*

23. Investigators spoke with CHS 2 about MCKENZIE and the Five Plus PPP loan. CHS 2 stated that he had met MCKENZIE through Augustin. According to CHS2, the three of them had discussed MCKENZIE's PPP loan, as well as MCKENZIE's referrals, for which MCKENZIE would receive a small cut. As stated above, CHS 2 and Augustin had already agreed to share the 25% kickback payments that CHS 2 would usually receive from referrals, including from MCKENZIE's referrals.

24. As to the Five Plus PPP loan, CHS 2 confirmed that the loan application was fraudulent. CHS 2 stated that he: (1) created for MCKENZIE an online account for Five Plus with Bank Processor 1; (2) created and submitted the fake Five Plus bank statement; and (3) created and submitted the false Forms 941. According to CHS 2, however, he emailed the Forms 941 to MCKENZIE unsigned, and then MCKENZIE emailed the forms back to him with signatures. (As described below, I have reviewed emails that appear to corroborate CHS 2's description of this email exchange.)

25. According to CHS 2, MCKENZIE's PPP loan application was ultimately rejected.

26. IP session records from Bank Processor 1 corroborate CHS 2's statement that he assisted with the submission of the Five Plus loan application. Bank Processor 1's IP records for that loan application show that a computer with an IP address (ending in 170) associated with CHS 2's residence in Broward County, Florida, logged into the Five Plus loan account as early as May 16, 2020. The session records also reveal subsequent logins by the same IP address (ending in 170), as well as by a computer associated with the Broward County residence of one of Augustin's associates, and by mobile devices. One of those mobile devices (with an IP addressing ending in

250) logged into the Five Plus loan account as early as May 16, 2020, and, according to bank records, also accessed MCKENZIE's personal bank account that day.

27.  CHS 2 also stated that, in addition to the Five Plus loan, MCKENZIE referred to him a number of friends/associates for the purpose of creating and submitting additional fraudulent PPP loans. As stated above, CHS 2 and Augustin would generally share the kickback payments for these referrals. CHS 2 stated that, at some point in the scheme, Augustin instructed him not to pay MCKENZIE a portion of the kickback payments that CHS 2 received from MCKENZIE's referrals. According to CHS 2, when MCKENZIE would inquire about not receiving his cut, CHS 2 would refer him to Augustin.

### *Emails and Text Messages Confirm MCKENZIE's Knowing Participation in the Fraud*

28.  As part of its investigation, law enforcement obtained communications between CHS 2 and MCKENZIE, including text messages and emails. I have reviewed a number of these communications, which discuss, among other things, MCKENZIE's PPP loan and the loans for individuals MCKENZIE referred to CHS 2.

29.  On or about May 15, 2020, CHS 2 emailed MCKENZIE Forms 941 for Five Plus for all four quarters of 2019. The forms were filled out (including stating that Five Plus had 10 employees and almost $300,000 in quarterly payroll) but were not signed. The same day, MCKENZIE emailed CHS 2 signed copies of the four Forms 941.

30.  On or about May 16, 2020, MCKENZIE forwarded CHS 2 an email from Bank Processor 1 titled, "Your Paycheck Protection Program loan has been submitted." The email stated, in part: "Damion, Your application was sent to the SBA to be processed. Based on capacity, the SBA may take up to a few days to process your application."

31. On or about May 20, 2020, MCKENZIE texted CHS 2: "They said the voided check is under review once they done they will email." MCKENZIE then texted: "I dont have a business account for this business i am going to try to get one open today just in case they ask for it."

32. On or about May 19, 2020, MCKENZIE texted CHS 2 with information that appears to relate to a different fraudulent loan application, including: (1) a social security number; (2) date of birth; (3) email address; and (4) employer identification number ("EIN"). Later that day, MCKENZIE texted CHS 2: "Can you get [NAME REDACTED] at $290k?"

33. On or about May 19, 2020, CHS 2 separately emailed MCKENZIE a blank intake information form to be filled out with the personal and business information for MCKENZIE's referrals. And in a separate text message, CHS 2 stated: "I just sent you a form to fill out with each client its easier with us to upload application we are swamped Also if the corp and home address are the same just put same on corp address." On or about May 21, 2020, MCKENZIE emailed CHS 2 completed intake forms regarding two referrals.

34. During my review of MCKENZIE's communications with CHS 2, I found what appears to be information pertaining to at least ten different people and corporate entities. Further investigation, including review of data collected by the SBA and bank records, to date has identified PPP loans totaling more than $3.3 million corresponding to these names and entities.

### *Bank Records Confirm MCKENZIE's Knowing Participation in the Fraud*

35. I have reviewed CHS 2's bank records, which reflect payments to CHS 2 from MCKENZIE's referrals as well as payments by CHS 2 to Augustin (who had brought in MCKENZIE to the scheme). For example, on or about May 26, 2020, CHS 2 received a wire transfer in the amount of $122,155 related to a PPP application in the name of a company (hereinafter "Company 14") that MCKENZIE had referred to CHS 2. The same day, from that

same account, CHS 2 wired $39,970 into one of Augustin's bank accounts. CHS 2 confirmed that the payment to Augustin represented his share of the kickback from Company 14.[6]

36. Bank records and text messages also reflect payments directly to MCKENZIE from his referrals, followed by payments from MCKENZIE to CHS 2. For example, on June 8, 2020, CHS 2 provided MCKENZIE with his bank account information via text message and stated: "After your money send me 80k." MCKENZIE responded, "Ok." Separately, on or about June 8, 2020, MCKENZIE deposited two checks in the amounts of $85,000 and $90,000 from a company MCKENZIE had referred to CHS 2. On or about June 11, 2020, CHS 2 received a wire transfer in the amount of $80,000 directly from Five Plus. That same day, from the same account, CHS 2 wired $40,000 to one of Augustin's bank accounts. CHS 2 explained to investigators that the $80,000 transfer was in connection with one of MCKENZIE's referrals, who had wired the kickback payment directly to MCKENZIE instead of CHS 2.

37. Other banking records show deposits consistent with MCKENZIE receiving additional kickbacks. Between approximately May 26, 2020 and July 2, 2020, MCKENZIE received payments of $20,000, $5,000, and $45,000 from three separate companies. Different banking records show CHS 2 received separate payments from each of those three companies.

---

[6] Bank records show that on May 26, 2020, the same day CHS 2 paid $39,970 to Augustin, CHS 2 also made a purchase at a jewelry store in the amount of $73,000.

## CONCLUSION

38. Based on the forgoing, I respectfully submit that there is probable cause to believe that DAMION MCKENZIE committed the Target Offenses.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

MICHAEL BENIVEGNA
Special Agent
IRS-CI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 3d Day of August, 2020

HON. PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE